IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STEVEN HAY PINCUS HUETER, AKA TAO, ET AL., <br><br> Plaintiffs, <br><br> vs. <br><br> LEALAIALOA FRITZ MICHAEL KRUSE, ET AL., <br><br> Defendants. | CIV. NO. 21-00226 JMS-KJM <br><br> ORDER GRANTING (1) FEDERAL DEFENDANTS' MOTION TO DISMISS, ECF NO. 85; AND (2) DEFENDANT JAMES L. MCGUIRE'S MOTION TO DISMISS, ECF NO. 136 |

## ORDER GRANTING (1) FEDERAL DEFENDANTS' MOTION TO DISMISS, ECF NO. 85; AND (2) DEFENDANT JAMES L. MCGUIRE'S MOTION TO DISMISS, ECF NO. 136

## I. INTRODUCTION

Plaintiffs, residents of American Samoa, bring this pro se action against Debra Haaland, the United States Secretary of the Interior; Lealaialoa Fritz Michael Kruse, Chief Justice of the High Court of American Samoa; and James L. McGuire, a private individual (collectively, "Defendants"). Plaintiffs allege a variety of claims arising from a purported illegal ex parte communication between Justice Kruse and McGuire (collectively, "AS Defendants") during an underlying case in the High Court of American Samoa. They seek injunctive relief and damages against the AS Defendants, and they ask this court to compel the

Secretary of the Interior to exercise her plenary authority over American Samoa to prevent the AS Defendants from perpetrating any additional violations of Plaintiffs' rights.  Plaintiffs also seek a declaration that they have ownership rights over the land and water in Alega, a village in American Samoa.

Currently before the court is a Motion to Dismiss filed by the United States on behalf of Defendants Justice Kruse and the Secretary of the Interior (collectively, "Federal Defendants"), ECF No. 85; and a Motion to Dismiss filed by Defendant McGuire, ECF No. 136.  The United States moves for dismissal on a variety of grounds, arguing that (1) Plaintiffs lack standing; (2) the court lacks personal jurisdiction over Justice Kruse; (3) the court should abstain from hearing the case under the *Younger* abstention doctrine; and (4) Plaintiffs have failed to state any claim for relief.  McGuire moves to dismiss solely on the ground that the court lacks personal jurisdiction over him.

Analysis of each of these questions is complicated by the unique status of American Samoa, which is the only inhabited territory under the jurisdiction of the United States that is both unincorporated and unorganized. After careful review, the court concludes that Plaintiffs have standing, but that the court lacks personal jurisdiction over both AS Defendants.  Plaintiffs have also failed to state any cognizable claim for relief against any of the Defendants.  And further, the court must abstain from hearing the claim for declaratory relief

according to *Younger v. Harris*, 401 U.S. 37 (1971).  For these reasons, and as set forth in more detail to follow, the Motions to Dismiss are GRANTED.  Because amendment would be futile, the case is DISMISSED with prejudice.

## II.  BACKGROUND

This case stems from Plaintiffs' dissatisfaction with certain aspects of an underlying legal case in the High Court of American Samoa, HCLT # 28-2020.  The court therefore briefly sets forth pertinent facts about that underlying case.[1]  In addition, because American Samoa's unique status as an unincorporated, unorganized territory is relevant to the questions raised by this case, the court begins by providing background on the legal status of American Samoa.

### A.    Legal Status of American Samoa

#### 1.    *Governance of American Samoa*

The United States formally annexed American Samoa in 1900.  The territory was administered by the United States Navy until 1951, when authority was transferred to the Department of Interior, where it remains today.  *See* Exec. Order No. 10264 (June 29, 1951).

---

[1] Both parties rely on court filings and transcripts from HCLT # 28-2020.  *See, e.g.*, ECF Nos. 85-4, 85-5, 85-6, 127-1, 127-3.  The facts in these documents are not disputed by the parties.  The court takes judicial notice of these documents as "matters of public record."  *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011).

American Samoa, as well as the United States' other inhabited territories—Guam, the Commonwealth of the Northern Mariana Islands ("CNMI"), Puerto Rico, and the U.S. Virgin Islands—are considered "unincorporated" territories. *See Downes v. Bidwell*, 182 U.S. 244, 279-80 (1901). This means that the territories are not intended for incorporation into the union as states; they are instead "possessions"—"belonging to" but "not a part of the United States." *See id*. at 279-80, 287.[2]  Because the territories are legally designated "possessions" of the United States, they are not considered to have independent sovereignty under United States law; instead, they are subject to the plenary power

---

[2] The notion of "unincorporated territories" is grounded in the doctrine of territorial incorporation.  That doctrine "distinguishes between incorporated territories, which are intended for statehood from the time of acquisition[, such as the Northwest Territory,] and in which the entire Constitution applies *ex proprio vigore*, and unincorporated territories, which are not intended for statehood and in which only [certain] fundamental constitutional rights apply by their own force." *Commonwealth of N. Mariana Islands v. Atalig*, 723 F.2d 682, 688 (9th Cir. 1984).

The doctrine of territorial incorporation was devised by the Supreme Court in a series of cases at the turn of the 20th century commonly known as "the Insular Cases."  The origin of the doctrine is explicitly racist, grounded in the idea that overseas territories were unfit to become fully integrated into the United States because island peoples were "savage" and "different" from Anglo-Americans.  For similar reasons, the Court determined that these "alien races" were not fit to enjoy the full protections of the U.S. Constitution. *See Downes*, 182 U.S. at 279, 287 (reasoning that Puerto Rico could "belong[] to the United States, but not [be] a part of the United States within the revenue clauses of the Constitution," because its "alien races" were so incongruous with "Anglo-Saxon principles" that "the administration of government and justice . . . may for a time be impossible.").  Rather, beyond the most fundamental of rights, it would be left to Congress to determine which provisions of the Constitution applied in these territories. *Id.* at 268.  Despite the shameful genesis of this doctrine, *see Fitisemanu v. United States*, 1 F.4th 862, 869 (10th Cir. 2021), the Court has continued to apply it on the basis that it would be "impractical" and unnecessary to "extend full constitutional protections to territories the United States did not intend to govern indefinitely," *Boumediene v. Bush*, 553 U.S. 723, 758-60, 768 (2008).

of Congress.[3]  *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 71 (2016).  For the same reason, the United States Constitution does not apply of its own force in the territories—save for the most "fundamental" constitutional rights, including those to life, liberty, and property.  *Downes*, 182 U.S. at 279, 283.  Inhabitants of the territories cannot vote in federal elections and they have only non-voting representation in Congress.  *See* Government Accountability Office, American Samoa: Issues Associated with Some Federal Court Options 4 (2008) [hereinafter "GAO Report"].[4]

In contrast, Guam, CNMI, Puerto Rico, and the Virgin Islands are considered "organized" territories—meaning Congress has enacted legislation that establishes and delegates certain authority to civilian governments in each of these territories, including executive, legislative, and judicial branches.  *See, e.g.*, 48 U.S.C. § 1421 (Guam); 48 U.S.C. § 1801 (CNMI); 48 U.S.C. § 1541 (Virgin Islands); 48 U.S.C. § 731 (Puerto Rico).  These legislative acts also make most

---

[3] Although United States law does not recognize the innate sovereignty of the unincorporated territories, international law does.  The *jus cogens* norm of self-determination guarantees all peoples the right to complete independence and freedom, the right to determine their own political status, and the right to exercise sovereignty.  *See* United Nations Charter, art. 1; Declaration on the Granting of Independence to Colonial Countries and Peoples, G.A. Res. 1514 (XV) (1960).  Recognizing that colonialism fundamentally abrogates the self-determination of colonized peoples, the United Nations issued a mandate in 1960 calling for the "speedy and unconditional end [to] colonialism in all its forms and manifestations."  G.A. Res. 1514 (XV).

[4] The GAO Report was prepared for Congress to address "American Samoa's system for addressing matters of federal law."  GAO Report at prefatory "Highlights" page ("Why GAO Did This Study").

inhabitants of these territories U.S. citizens and extend most provisions of the United States Constitution to the territories. *See e.g.*, *Davis v. Guam*, 2017 WL 930825, at *12 (D. Guam Mar. 8, 2017), *aff'd*, 932 F.3d 822 (9th Cir. 2019) (citing 48 U.S.C. § 1421b(u)).

Congress has never enacted comparable legislation for American Samoa, making American Samoa the only inhabited territory that remains "unorganized." *See Fitisemanu v. United States*, 1 F.4th 862, 875 n.15 (10th Cir. 2021). Consequently, inhabitants of American Samoa are not U.S. citizens, but U.S. nationals. *Tuaua v. United States*, 788 F.3d 300, 301 (D.C. Cir. 2015) ("*Tuaua II*"). Further, because Congress has not extended any provisions of the U.S. Constitution to the territory, inhabitants of American Samoa are "entitled under the principles of the Constitution to be protected in life, liberty, and property . . . [but they are] not possessed of the political rights of citizens of the United States." *Id*. at 308 (quoting *Downes*, 182 U.S. at 283).[5]  And, most significantly

---

[5] Representatives of the Government of American Samoa tend to oppose further application of the United States Constitution to American Samoa, noting that U.S. constitutional principles could disrupt the Samoan way of life, especially with respect to communal land tenure. *Tuaua II*, 788 F.3d at 309-10; *see also Fitisemanu*, 1 F.4th at 870, 880 (noting that "[c]onstitutional provisions such as the Equal Protection Clause, the Takings Clause, and the Establishment Clause are difficult to reconcile with several traditional American Samoan practices, such as the matai chieftain social structure, communal land ownership, and communal regulation of religious practice" and suggesting that "[n]otwithstanding its beginnings, the approach developed in the Insular Cases and carried forward in recent Supreme Court decisions can be repurposed to preserve the dignity and autonomy of the peoples of America's overseas territories.").

for present purposes, Congress has not created or delegated authority to a territorial government in American Samoa. *Fitisemanu*, 1 F.4th at 875 n.15 (stating that absent organizing legislation, American Samoa is "especially subject to American political control"). Instead, American Samoa remains under the "plenary authority" of the Secretary of the Interior. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 830 F.2d 374, 375 (D.C. Cir. 1987) ("*Hodel II*"); Exec. Order. 10264 (vesting the Secretary of the Interior with "all civil, judicial, and military powers" of government in American Samoa).

The people of American Samoa adopted their own Constitution by referendum, which was approved by the Secretary of the Interior in 1967. *See Tuaua v. United States*, 951 F. Supp. 2d 88, 90 (D.D.C. 2013). In 1977, the Secretary permitted the governor to be selected by popular vote. *Id.* And in 1983, Congress passed legislation specifying that any amendment or modification to the constitution of American Samoa, "as approved by the Secretary of the Interior . . . may be made only by an Act of Congress." 48 U.S.C. § 1662a.

2.    *American Samoa Judicial System*

American Samoa's unique status as an unorganized, unincorporated territory also creates peculiarities in the territory's judicial system. American Samoa's judiciary consists of a district court and a High Court. Am. Samoa Const. art. III, § 1; Am. Samoa Code ("ASC") tit. 3. The district court adjudicates minor civil cases, such as small claims, and minor criminal offenses, such as traffic violations. The High Court, meanwhile, consists of four divisions—the Trial Division; the Land and Titles Division; the Family, Drug, and Alcohol Division; and the Appellate Division. ASC §§ 3.0207, 3.0501. The Family, Drug, and Alcohol Division has jurisdiction over "all matters affecting families, from juvenile offenses to domestic violence and adoptions to divorce and child support." *Id.* § 3.0501. The Land and Titles Division has exclusive jurisdiction over all controversies related to land. *Id.* § 3.0208(b). The Trial Division is a court of "general jurisdiction" with "the power to hear any matter not otherwise provided for by statute." *Id.* § 3.0208(a). And the Appellate Division "shall have jurisdiction to review, on appeal, final decisions of the trial and land and titles divisions of the High Court," as well as certain decisions of the district court and certain administrative proceedings. *Id.* § 3.0208(c).

The entire territorial court system is "under the administration and supervision" of a Chief Justice. *Id*. § 3.0102. The Chief Justice sits on the High

Court along with an Associate Justice and a number of Associate Judges.  The

Chief Justice and Associate Justice are law-trained.  *Id.* § 3.1001(a).  The Associate

Judges are not required to have legal training, but are instead "appointed based on

their knowledge of Samoan culture and tradition."  GAO Report at 24.

The judicial branch, like the rest of American Samoa's government, is

under the plenary authority of the Secretary of the Interior.  As such, the Secretary

of the Interior "appoint[s] a Chief Justice of American Samoa and such Associate

Justices as he may deem necessary" and may remove them for cause.  Am. Sam.

Const. art. III, § 3; ASC § 3.1001(b).  The Associate Judges, meanwhile, are

appointed by the Governor of American Samoa, ASC § 3.1004(a), although such

executive branch decisions are also subject to veto by the Secretary of the Interior.

Litigants have no right to file a petition for writ of certiorari in the U.S. Supreme

Court after receiving an adverse decision from an American Samoa court; instead,

litigants may only appeal to the Secretary of the Interior, who has the authority to

overturn High Court decisions.  GAO Report at 11; *see also* Michael W. Weaver,

*The Territory Federal Jurisdiction Forgot*, 17 Pac. Rim L. & Pol'y J. 325, 325

(2008).  In contrast, in the organized territories (e.g., Guam, CNMI), Congress has

provided litigants the right to file a petition for writ of certiorari in the U.S.

Supreme Court challenging a final judgment of the highest territorial court.  *See*

GAO Report at 11.

Unlike the organized territories, American Samoa does not have a federal court and is not part of a federal judicial district. The High Court Trial Division has been expressly delegated authority to hear certain claims ordinarily under exclusive federal jurisdiction, including admiralty and maritime matters, but otherwise there is no court in the territory with subject-matter jurisdiction over questions of exclusively federal law. *See* ASC § 3.0208(a); GAO Report at 2.

The litigation underlying this case is pending before the High Court Land and Titles Division. That division comprises the Chief Justice, the Associate Justice, and all of the Associate Judges. ASC § 3.0240. "All controversies relating to land shall be heard and decided by a justice and 2 associate judges," with "the presence of a justice and 1 associate judge being necessary to constitute a quorum for the trial and determination of a case or controversy." *Id.* When the presiding judicial officers disagree, the opinion of the Chief Justice "prevails and is recorded by the clerk as the opinion and decision of the court." *Id.* § 3.0241.

Final decisions of the Land and Titles Division are appealable to the Appellate Division, which is composed of "the Chief Justice, the Associate Justice, Acting Associate Justices appointed by the Secretary of the Interior, and all the associate judges." *Id.* § 3.0220. "Sessions of the appellate division shall be held before 3 justices and 2 associate judges, the presence of 2 of the justices and 1 associate judge being necessary to constitute a quorum for the trial and

10

determination of a case or controversy." *Id.* Where the appellate panel disagrees in land or title cases, "the opinion of the majority of the 5 judges shall prevail." *Id.* § 3.0221. No justice or judge that presided over a trial-level proceeding is permitted to sit on the appellate panel for the same case. *Id.* § 3.1007(b) ("Neither the Chief Justice, nor the Associate Justice, nor any associate judge of the High Court shall sit in the appellate division of that court in the hearing and determination of any appeal from the decision of a case or question decided by him, or the decision of which he joined in the trial court."). The duty of judges and justices involved in cases at the trial level to recuse from those cases on appeal is mandatory. *See Meredith v. Atualevao*, AP No. 06-79 (App. Div. 1979).

     3.   *Land Tenure in American Samoa*

       Land tenure in American Samoa is largely governed by indigenous Samoan law rather than American property law principles. *See, e.g.*, *Fitisemanu*, 1 F.4th at 866. Samoan land tenure law is part of *Fa'a Samoa*—the Samoan way of life. *Id.* Land ownership is predominantly communal, with more than 90 percent of American Samoan land belonging to *'aiga*, or large, extended family units comprising people related by blood, marriage, or adoption. *Id.* Each *'aiga* shares communally owned family land and is led by a *matai* (chief). *Id.* Each *matai* is "responsible for the welfare of their respective *'aiga* and play[s] a central role in protecting and allocating family lands." GAO Report at 7. In addition, American

Samoa law imposes ancestry-based requirements for land ownership, prohibiting, for example, alienation of land to any person who is "less than one-half native blood."  ASC § 37.0204 (a)-(b).  Land—particularly the connection between an *'aiga* and their land—is of fundamental importance to American Samoan culture and identity.  *See* Line-Noue Memea Kruse, *The Pacific Insular Case of American Samoa* 2 (2018) ("Cultural identity is the core basis of the Samoan people, and communally owned lands are the central foundation that will allow our cultural identity to survive in today's world.").

Given the centrality of land to American Samoan culture and identity, parties with disputes over communal land are required by statute to attempt to resolve their dispute before the Office of Samoan Affairs prior to pursuing litigation before the Land and Titles Division.  *See* ASC § 43.0302(a).  Only if the Secretary of Samoan Affairs is unable to resolve the dispute and issues a Certificate of Irreconcilable Dispute ("CID") may the parties proceed with litigation.  *Id*.  That said, the High Court Land and Titles Division may issue temporary relief, such as a temporary restraining order, prior to receiving a CID from the Office of Samoan Affairs "to prevent the occurring of irreconcilable damages."  *Id.* § 43.0302(b).

B.     **Factual Background**

Pro se Plaintiffs Steven Jay Pincus Hueter, Faamuli Pete Faamuli, and Michael "Candyman" Kirk ("Plaintiffs") are residents of Alega Village, American Samoa.[6]  ECF No. 14 at PageID ## 244-45.  Plaintiffs are all officers of the Alega Preservation Institute, a 501(c)(3) public charity responsible for stewardship of the Alega Marine and Wildlife Sanctuary and Reserve, a private marine reserve in Alega Village.  *Id.*  Plaintiff Faamuli Pete Faamuli is also the Sa'O (Chief) of Alega Village.  *Id.* at PageID # 244.  Defendant Lealaialoa Fritz Michael Kruse is the Chief Justice of American Samoa.  *Id.* at PageID # 245.  Defendant James L. McGuire is a private legal practitioner in American Samoa.  *Id.*  And Defendant Debra Haaland is the United States Secretary of the Interior (the "Secretary").  *Id.* at PageID # 246.

To the best of the court's understanding, the factual background of this case is as follows:  On September 23, 2020, AST Telecomm d/b/a Bluesky Communications ("Bluesky"), a telecommunications carrier operating in American Samoa, filed a "Complaint for Permanent Injunction" in the High Court of American Samoa against several of the Plaintiffs in this matter—Michael Kirk and Faamuli Pete Faamuli, as well as the Alega Preservation Institute and Rosalia Tisa

---

[6] Rosalia Tisa Faamuli was also initially named as a Plaintiff but has since voluntarily withdrawn from the suit.  *See* ECF Nos. 45, 48.

Faamuli (together, the "Alega Defendants").[7]  ECF No. 85-4 at PageID ## 1133-

34.  That case, docketed as HCLT # 28-2020, is before Chief Justice Kruse,

Associate Judge Fa'amausili, and Associate Judge Muasau.  *See* ECF No. 85-5 at

PageID # 1140.  In its complaint in that case, Bluesky alleged that it has a

prescriptive easement to hang its telecommunications equipment in the Alega

Sanctuary, and that the Alega Defendants were interfering with Bluesky's attempts

to maintain and repair its equipment within the preserve.  ECF No. 85-4 at PageID

# 1137.  Bluesky also alleged that it was the target of a "smear campaign"

conducted by the Alega Defendants through the publication of materials stating

that Bluesky was polluting the marine environment with telecommunications

detritus.  *Id.*

On November 12, 2020, the High Court's three-judge panel issued an

"Order Denying [Bluesky's] Motion for a Preliminary Injunction and to Maintain

the Status Quo."  ECF No. 85-5 (the "November 12, 2020 Order").  The High

Court opined that Bluesky had failed to supply sufficient evidence that it possesses

an easement over the Alega Defendants' land, concluding that "[w]ithout more to

evince the landowner's consent, [Bluesky's] rerouting [of infrastructure through

---

[7] Bluesky apparently initiated the case identifying itself simply as "Bluesky
Communications," and was therefore treated by the High Court as a fictitious entity until it was
properly identified as AST Telecomm d/b/a Bluesky Communications.  *See* ECF No. 85-5 at
PageID # 1141 n.1.

Alega] constitutes a blatant trespass." *Id.* at PageID # 1150.  The court also denied

Bluesky's request to enjoin the Alega Defendants' publications, explaining "we are

not inclined to invoke equity to enjoin [the Alega Defendants'] first amendment

protected activity in the way of printed posters deemed offensive to [Bluesky]."

*Id.*

Pursuant to ASC § 43.0304, which authorizes a chief or associate

justice to "make such interim orders as he thinks appropriate" in proceedings

before the Land and Titles Division, Justice Kruse ordered both parties to

"maintain the status quo for at least a period of 180 days" during which the parties

were to attempt to reach an amicable solution.  ECF No. 85-5 at PageID # 1150.

Justice Kruse also enjoined Bluesky from "failing[] to remove all its wiring-related

detritus and decaying poles left lying on and around the Alega coastline and beach

area." *Id.* at PageID ## 1150-51.  Although Justice Kruse issued this preliminary

relief, the Order explained that the High Court lacked jurisdiction to provide any

dispositive rulings on the merits because there was a "contention among the parties

as to whether the subject matter land is 'communal' or 'individually-owned,'" with

the Alega Defendants having "put at issue the communal landholding nature of

Alega." *Id.* at PageID # 1142.  And, as the Order explained, the High Court lacks

jurisdiction over the merits in cases concerning communally-owned land until the

parties complete mandatory pretrial proceedings before the Office of Samoan

Affairs.  *Id.* (citing ASC § 43.0302; *Magalei v. Territorial Registrar*, AP No. 13-12, slip. op. at 52 (App. Div. Sept. 12, 2014)).

On March 3, 2021, Bluesky filed a "Motion to Vacate and/or Amend the November 12, 2020 Order."  ECF No. 85-6.  Bluesky asked the High Court to vacate its ruling that Bluesky "is so enjoined from failing[] to remove all its wiring-related detritus and decaying poles lying on and around the Alega coastline and beach area."  *Id*. at PageID # 1153.  And Bluesky asked the court to enjoin the Alega Defendants from "interference of Bluesky's . . . removal of its cables and wires in Alega."  *Id.*  Bluesky alleged that it had been attempting to comply with the November 12, 2020 Order, but that doing so required coordination with the American Samoa Power Authority ("ASPA"), the public utility that owns the poles to which Bluesky's cables are attached.  *See id.* at PageID # 1154.  Bluesky further alleged that the Alega Defendants were preventing its clean-up attempts by "unreasonably demand[ing] that Bluesky is not to coordinate and communicate with ASPA regarding the cleanup of debris and poles in Alega."  *Id*.

The High Court held a hearing on Bluesky's Motion on March 31, 2021, presided over by Justice Kruse and Associate Judge Muasau.  ECF No. 127-1 at PageID # 1986.  At the outset of the hearing, Justice Kruse apparently saw Mr. McGuire—who was not representing any party and was not otherwise involved in the case—sitting in the gallery and asked him to approach the bench.  *Id.* at PageID

# 1988.  The two had a conversation off the record.  *Id.*  After that conversation, the hearing began, with the parties entering their appearances for the record.  *Id.*[8]

During the hearing, Justice Kruse stated that he was "not inclined" to grant Bluesky's Motion.  *Id.*  He also reiterated that the High Court lacked jurisdiction over the controversy until the parties obtained a CID from the Office of Samoan Affairs.  *Id.* at PageID # 1989.  Justice Kruse further explained that the High Court would be joining the American Samoa Government as a necessary party because the Alega Defendants alleged, among other things, that Bluesky polluted areas under the Government's control.[9]  *Id.*; *see also* ECF No. 85-10 at PageID # 1215.  Finally, Justice Kruse reiterated that the November 12, 2020

---

[8] The hearing transcript reflects the following:

THE COURT:  All right.  Call the calendar.

THE CLERK:  HCLT No. 28-20.  Bluesky Communications versus Tisa Fa'amuli et al.,

THE COURT:  For appearances.  I see Mr. McGuire in court.  Could you come forward to the bench, please?  I have a question for you.  I don't need a record.

(Off the record).

THE COURT:  All right.  Appearances, please?

ECF No. 127-1 at PageID # 1988.

[9] Specifically, the Alega Defendants alleged that Bluesky polluted land "permanently or periodically covered by tidal waters up to the line of mean high tide," 48 U.S.C. § 1705, which is "administered in trust" by the Government of American Samoa for the benefit of the people of American Samoa, *id*.  *See* ECF No. 127-1 at PageID ## 1989-90.

Order enjoined both parties from disrupting the "status quo" and required Bluesky to remove their detritus from the ground in Alega.  ECF No. 127-1 at PageID ## 1989, 1995.[10]  The High Court then entered an April 6, 2021 Order that joined the American Samoa Government as a necessary party to the proceedings and imposed a stay on any further filings going to the merits until the parties obtained a CID from the Office of Samoan Affairs.  ECF No. 85-10 at PageID ## 1215-16.

On May 11, 2021, Plaintiffs, proceeding pro se, initiated this federal court action.  ECF No. 1.

## C.    Procedural Background

On May 18, 2021, Plaintiffs filed a Verified Amended Complaint against Justice Kruse in his personal and official capacity; McGuire; and the Secretary of the Interior in her personal and official capacity.  ECF No. 14.  And on May 19, 2021, Plaintiffs filed a Motion for "Declaration of Rights and for Temporary Restraining Order and for Preliminary Injunction and for Permanent Injunction."  ECF No. 17 ("Motion for TRO").

In both the Complaint and Motion for TRO, Plaintiffs allege that Justice Kruse engaged in an illegal ex parte communication "by calling James L. McGuire to the bench for a private conversation off the record at a [High Court]

---

[10] Justice Kruse also clarified that the temporary injunctive relief extended only to detritus owned by Bluesky that was on land owned by the Alega Defendants.  ECF No. 127-1 at PageID ## 1990, 1995.

hearing." ECF No. 14 at PageID # 253; ECF No. 17 at PageID # 371. They allege that "[a]fter the illegal ex-parte conversation . . . Justice Kruse change[d] his position, and verbally Order[ed] no cleanup of pollution by the Defendant [Bluesky] on the Alega beach." ECF No. 14 at PageID # 253. Plaintiffs also complain that Justice Kruse failed to hold Bluesky in contempt of court for disregarding the November 12, 2020 Order enjoining it from "failing to clean" its detritus within the Alega Marine Protected Area. *Id.* at PageID # 254. Plaintiffs seek damages as well as injunctive relief against the AS Defendants to stop them from "interfering with the cleanup of pollution on the land or in the waters of . . . Alega [Beach]." *Id.* at PageID # 267. In addition, Plaintiffs ask the court to order the Secretary of the Interior to exercise her plenary authority over the judicial system of American Samoa to "coerce" the AS Defendants to "stop interfering with cleanup of corporate and government pollution on the private Alega Marine Protected Area." *Id.* at PageID ## 267-68.[11] Finally, Plaintiffs seek a "Declaration of Rights that Plaintiff Chief Faamuli Pete Faamuli . . . [has] valid existing rights to land and water in Alega." ECF No. 14 at PageID # 269.

---

[11] Although the Amended Complaint only requests the court to compel the Secretary to cause Justice Kruse to stop interfering, *see* ECF No. 14 at PageID ## 267-68 (listing Justice Kruse twice), it is clear from the context of the Amended Complaint that Plaintiffs in fact request this relief as to both Justice Kruse and McGuire, not only Justice Kruse.

On June 3, 2021, the court raised concerns that "[f]rom the face of the Complaint and Motion [for TRO], it is unclear whether the court has subject matter jurisdiction over this case." ECF No. 29. The court therefore ordered Plaintiffs to submit a supplemental memorandum identifying (1) the laws Plaintiffs allege the AS Defendants are violating; (2) the legal bases for subject-matter jurisdiction over and injunctive relief against the AS Defendants; and (3) the legal basis for the courts subject-matter jurisdiction for claims against the Secretary of the Interior under *King v. Morton*, 520 F.2d 1140 (D.C. Cir. 1975). ECF No. 29.

Plaintiffs submitted their Supplemental Memorandum on June 5, 2021. ECF No. 33. Against McGuire, they allege solely violations of the ABA Model Code of Professional Conduct. *Id.* at PageID # 637.[12] Against Justice Kruse, they allege (1) violations of the ABA Code of Judicial Conduct; (2) violations of 28 U.S.C. § 351, a statute that sets out the procedure for lodging an administrative complaint against a federal judge; and (3) violations of their constitutional right to due process pursuant to 42 U.S.C. § 1983. ECF No. 33 at PageID ## 637-40. Plaintiffs also allege that by "interfer[ing] with the cleanup [of the Alega Beach]," which is a habitat for endangered green and hawksbill sea

---

[12] Plaintiffs also allege violations of the "ABA Model Code Of Professional Ethics." ECF No. 33 at PageID # 637. But because there is no Model Code of Professional Ethics that is separate from the Model Code of Professional Conduct, the court construes all of Plaintiffs' claims against McGuire as arising under the Model Code of Professional Conduct.

turtles, the AS Defendants' conduct is "in association with violations of the Endangered Species Act" ("ESA") purportedly committed by Bluesky.  *Id.* at PageID ## 637-38.[13]  Plaintiffs assert that injunctive relief is warranted against Justice Kruse because he "made Declaratory Relief unavailable by placing a stay on HCLT [# 28]-2020 and prohibiting any further filings."  *Id.* at PageID # 639.  Plaintiffs did not provide an explanation as to why injunctive relief would be warranted against McGuire.  Finally, with respect to their claims against the Secretary of the Interior, Plaintiffs assert that under *King v. Morton*, 520 F.2d 1140 (D.C. Cir. 1975), the Secretary has "authority to review decisions of the High Court [of American Samoa] to assure they comply with any standards of the United States Constitution found to apply to American Samoa."  ECF No. 33 at PageID # 649 (quoting *Corp. of Presiding Bishop of Church of Jesus Christ of*

---

[13] The court does not construe Plaintiffs' claim that the AS Defendants' conduct is "associated" with violations of the ESA as asserting an ESA claim.  And, to the extent Plaintiffs are asserting such a claim, it fails; Plaintiffs have not alleged any conduct by Defendants that would implicate the Endangered Species Act.  Further, even is such an "associational" ESA claim existed, this court would lack jurisdiction over it.  At least sixty days before bringing suit under the ESA, prospective plaintiffs must provide written notice of the alleged violation to the Secretary of the Interior.  *See* 16 U.S.C. § 1540(g)(1)(A) and (g)(2)(A)(i).  This sixty-day notice requirement is jurisdictional.  *See Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988).  And in their opposition memorandum, Plaintiffs admit that they failed to satisfy this 60-day jurisdictional requirement before filing suit.  *See* ECF No. 127 at PageID # 1977 (stating that "Plaintiffs' Endangered Species Act claim can succeed, when appropriately refiled after any and all required 60 day notices have been satisfied").  As the Supreme Court has explained, staying rather than dismissing a case until the 60-day requirement has been satisfied "flatly contradicts the language of the statute."  *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26 (1989).

*Latter-Day Saints v. Hodel*, 637 F. Supp. 1398, 1413 n.29 (D.D.C. 1986) ("*Hodel I*") (citing *King*, 520 F.2d at 1144)).

On June 30, 2021, the United States entered an appearance and indicated that it would be representing Justice Kruse and the Secretary of the Interior.  ECF No. 55; *see also* ECF No. 147.[14]  On July 16, 2021, the United States filed a Motion to Dismiss and Opposition to Plaintiffs' Motion for TRO. ECF No. 85.  The United States argues that the case should be dismissed because (1) Plaintiffs lack standing; (2) the court lacks personal jurisdiction over Justice Kruse; (3) the court should abstain under *Younger v. Harris*, 401 U.S. 37 (1971); and (4) Plaintiffs have failed to state a claim.  ECF No. 85-1 at PageID ## 1093-1105.  On August 8, 2021, Plaintiffs filed an Opposition to the Motion to Dismiss and Reply to the Opposition to the Motion for TRO.  ECF No. 127.  And on August 16, 2021, the United States filed a Reply.  ECF No. 131.

On September 7, 2021, Defendant McGuire filed a Motion to Dismiss the claims against him for lack of personal jurisdiction.  ECF No. 136.  On September 9, 2021, the court requested supplemental briefing on whether personal jurisdiction over the AS Defendants is proper pursuant to Federal Rule of Civil Procedure 4(k)(2).  ECF No. 139.  The court also ordered the parties to address that

---

[14] The United States represents Justice Kruse and the Secretary in both their official and individual capacities.  *See* ECF No. 85-1 at PageID # 1082 n.2; ECF No. 147.

issue in their briefing on McGuire's Motion to Dismiss.  ECF No. 138.  Plaintiffs submitted their Opposition to McGuire's Motion on September 9, 2021, ECF No. 140, and their supplemental brief on September 11, 2021, ECF No. 142.  The United States submitted its supplemental brief on September 17, 2021.  ECF No. 143.  McGuire filed his Reply to Plaintiffs' Opposition on September 24, 2021. ECF No. 146.

On October 20, 2021, the court requested further supplemental briefing addressing how the jurisdictional limitations of the High Court might affect application of Rule 4(k)(2) in this matter.  ECF No. 151.  Plaintiffs submitted their response on October 21, 2021, ECF No. 152, and the United States submitted its response on November 12, 2021, ECF No. 153.  This matter is decided without a hearing pursuant to Local Rule 7.1(c).

### III.  <u>STANDARDS OF REVIEW</u>

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

A federal court's subject-matter jurisdiction may be challenged by motion pursuant to Federal Rule of Civil Procedure 12(b)(1).  "[The] party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996) (per curiam).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Here, Defendants raise a facial attack—they "assert[] that the [Complaint's] allegations . . . are insufficient on their face to invoke federal jurisdiction." *Id.* The court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient to invoke the court's jurisdiction. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). The court will dismiss a party's claim for lack of subject matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation and quotation marks omitted); *see* Fed. R. Civ. P. 12(b)(1).

## B.    Motion to Dismiss for Lack of Personal Jurisdiction

A federal court's personal jurisdiction may be challenged by motion pursuant to Federal Rule of Civil Procedure 12(b)(2). To withstand a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing jurisdictional facts. *See In re Boon Global Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima

facie showing of jurisdictional facts to withstand the motion to dismiss.'"

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011)

(quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th

Cir. 2010)).  "[U]ncontroverted allegations in [the] complaint must be taken as

true, and conflicts between the facts contained in the parties' affidavits must be

resolved in [the plaintiff's] favor."  *Brayton Purcell*, 606 F.3d at 1127 (quoting *Rio

Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002)).

## C.   Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss

for "failure to state a claim upon which relief can be granted."  A Rule 12(b)(6)

dismissal is proper when there is either a "lack of a cognizable legal theory or the

absence of sufficient facts alleged."  *UMG Recordings, Inc. v. Shelter Capital

Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica

Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988), as amended (May 11, 1990)).

"To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)); *see also Weber v. Dep't of Veterans Affs.*,

521 F.3d 1061, 1065 (9th Cir. 2008).  This tenet—that the court must accept as true

all of the allegations contained in the complaint—"is inapplicable to legal

conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Factual allegations that only permit the court to infer "the mere possibility of misconduct" do not show that the pleader is entitled to relief.  *Id.* at 679.

### D.    Pro Se Plaintiffs

Because Plaintiffs are proceeding pro se, the court liberally construes their Amended Complaint.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987).  The court also recognizes that "[u]nless it is absolutely clear that no amendment can cure the defect . . . a pro se litigant is entitled to notice of the complaint's deficiencies and an opportunity to amend prior to dismissal of the action."  *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995); *see also Crowley v. Bannister*, 734 F.3d 967, 977-78 (9th Cir. 2013).  A court may, however, deny leave to amend where further amendment would be futile.  *See, e.g.*, *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (reiterating that a district court may deny leave to

amend for, among other reasons, "repeated failure to cure deficiencies by amendments previously allowed . . . [and] futility of amendment").

## IV.  ANALYSIS

### A.     Standing

The United States argues that the court lacks subject-matter jurisdiction over this case because "Plaintiffs lack Article III standing to sue." ECF No. 85-1 at PageID # 1093.  The court disagrees.

The doctrine of standing "restricts 'the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'"  *Dutta v. State Farm Ins. Co.*, 895 F.3d 1166, 1172 (9th Cir. 2018) (quoting *Spokeo Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  "A plaintiff may not bring a generalized grievance, but rather must 'show a personal stake in the outcome of the controversy.'"  *Id.* (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018)).  In order to satisfy Article III's standing requirements, plaintiffs must show "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  When undertaking a standing analysis, courts

address the jurisdictional question (i.e., "does the court have power under Article III to hear the case?") but do *not* address the merits question (i.e., "did the defendant violate the law?"). *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000). "One does not lose standing to sue just because his claims may fail on the merits." *Inland Empire Waterkeeper v. Corona Clay Co.*, 13 F.4th 917, 926 (9th Cir. 2021).

Liberally construing the pro se Amended Complaint, Plaintiffs have pled sufficient facts to establish standing. First, to establish an "injury in fact," Plaintiffs must point to "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Carrico v. City and Cnty. of S.F.*, 656 F.3d 1002, 1005 (9th Cir. 2011). To be "concrete" the injury "must actually exist"— it must be "real" and "not abstract." *Dutta*, 895 F.3d at 1173. And to be "particularized," "the injury must affect the plaintiff in a personal and individual way." *Id*.

Here, Plaintiffs allege that they were injured when the AS Defendants engaged in an "ex parte communication" in violation of the procedural prohibition against improper ex parte communications with judicial officers. *See, e.g.*, *Pro. Air Traffic Controllers Org. v. Fed. Lab. Rels. Auth.*, 685 F.2d 547, 570 (D.C. Cir. 1982). It is well-settled that such a "'procedural injury' can constitute an injury in fact for the purpose of establishing standing" so long as the plaintiff is "seeking 'to

enforce a procedural requirement the disregard of which could impair a separate concrete interest.'"  *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 446 (9th Cir. 1994) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 (1992)); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011).[15] And Plaintiffs have sufficiently alleged that this violation resulted in a concrete harm—they allege that as a result of the ex parte communication with McGuire, Justice Kruse reversed his written order requiring Bluesky to remove detritus from the Alega Marine Preserve, thereby preventing clean-up of harmful pollution.  ECF No. 14 at PageID # 253.  Plaintiffs have also established that this alleged injury to the Alega Marine Preserve is "personal"; Plaintiff Faamuli is the traditional leader of Alega Village (encompassing the Alega Marine Preserve) and claims an ownership interest in the Alega Village water and lands, *see* ECF No. 14 at PageID # 248.[16]  Finally, Plaintiffs allege that the harm is ongoing, thus demonstrating that the harm is "actual" rather than hypothetical or conjectural.  In short, Plaintiffs have satisfactorily alleged an injury in fact.

---

[15] Although "procedural injuries" have typically been found in the context of agency proceedings, the court is aware of no authority that precludes application of that doctrine to judicial proceedings.

[16] Because Plaintiff Faamuli plainly has standing, the court need not consider the standing of the other Plaintiffs.  *See, e.g., City of S. Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 233 (9th Cir. 1980) ("A threshold question in every federal case is . . . whether at least one plaintiff has standing.").

Next, Plaintiffs have shown that the alleged injury is fairly traceable to the challenged action.  This requirement can be satisfied "even if there are multiple links in the [causal] chain, . . . as long as the chain is not hypothetical or tenuous." *Juliana v. United States*, 947 F.3d 1159, 1169 (9th Cir. 2020) (internal citation and quotation marks omitted) (finding the federal government's systemic failure to adequately regulate fossil fuel production and consumption to be fairly traceable to plaintiffs' climate-change related injuries).  Further, a defendant's conduct need not be the "sole source of [the alleged] injury." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 748 (9th Cir. 2020).  For example, in *Skyline Wesleyan Church*, the California Department of Managed Health Care ("DMHC") changed its policy allowing insurance providers to exclude abortion-related medical expenses to requiring coverage for these expenses.  This induced the plaintiff's insurance provider, a DMHC-regulated entity, to expand its policy to cover abortion-related expenses—a change that the plaintiff alleged infringed upon its right to freely practice its religion.  968 F.3d at 748.  The plaintiff's injury was found fairly traceable to DMHC's policy change, notwithstanding the fact that the plaintiff could freely elect to purchase a health insurance plan that accorded with its religious beliefs from a non-DMHC regulated entity but declined to do so.  *Id.*

30

Here, the causal connection is much more direct.  Plaintiffs allege that Justice Kruse ordered injunctive relief requiring Bluesky to clean up its pollution on Plaintiffs' property, but that based on his purportedly improper ex parte contact with McGuire, he verbally reversed that order, thereby allowing the pollution to remain on Plaintiffs' land.  That is, accepting Plaintiffs' allegation as true, it appears that "but for" the ex parte communication, the injunction in favor of Plaintiffs would have remained in force.  This is sufficient to satisfy the "fairly traceable" prong.

Finally, Plaintiffs have shown that the injury is likely to be redressed by a favorable court decision.  *See Tinian Women Ass'n v. United States Dept. of the Navy*, 976 F.3d 832, 839 (9th Cir. 2020).  As to this factor, the "plaintiffs' burden is relatively modest"; it is not necessary to show a "guarantee that [the plaintiffs'] injuries will be redressed."  *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012).  Instead, Plaintiffs must only show "that there would be a 'change in a legal status'" as a consequence of a favorable court decision "and that a 'practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered."  *Novak v. United States*, 795 F.3d 1012, 1019-20 (9th Cir. 2015).

Plaintiffs seek injunctive relief and damages against McGuire and Justice Kruse, injunctive relief against the Secretary, and declaratory relief related

to land ownership rights.  Plaintiffs' request for damages satisfies the redressability requirement for standing.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) (explaining that both nominal and compensatory damages can independently satisfy the redressability requirement for standing); *see also Steel Co.*, 523 U.S. at 127 (1998) (Stevens, J., concurring) ("When one private party is injured by another, the injury can be redressed in at least two ways: by awarding compensatory damages or by imposing a sanction on the wrongdoer that will minimize the risk that the harm-causing conduct will be repeated.").  In addition, it is well-settled that the Secretary of the Interior exercises plenary authority over the judiciary of American Samoa.  And it is at least possible that, in certain circumstances, a district court may adjudicate whether the Secretary has complied with her obligations to administer the territory to constitutional standards.  *See King*, 520 F.2d at 1148.  A favorable ruling in this respect would increase the likelihood that Plaintiffs receive relief that redresses their alleged injury.

Plaintiffs have adequately pled each of the elements of Article III standing.  Defendants' argument that Plaintiffs lack standing fails.

**B.    Personal Jurisdiction Over the AS Defendants**

The AS Defendants argue that claims against them should be dismissed because the court lacks personal jurisdiction over them.  They first argue that because they reside in American Samoa and the underlying controversy took

place entirely within American Samoa, neither AS Defendant has sufficient "minimum contacts" with Hawaii to afford this court jurisdiction under the Hawaii long-arm statute.  *See* Fed. R. Civ. P. 4(k)(1)(A).  In addition, they argue that the court cannot exercise personal jurisdiction under the federal long-arm statute, Federal Rule of Civil Procedure 4(k)(2).  *See* ECF No. 143 at PageID # 2166.  The court agrees that it lacks personal jurisdiction over both AS Defendants under both the Hawaii and federal long-arm statutes and addresses each long-arm statute in turn.

     *1.*    *Hawaii's Long-Arm Statute*

     "[P]ersonal jurisdiction over a[n out-of-state] defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process."  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  In the usual case, the long-arm prong of the inquiry is governed by Federal Rule of Civil Procedure 4(k)(1)(A), which provides that a federal district court may exercise personal jurisdiction if the defendant is "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"; that is, if the defendant is subject to personal jurisdiction under that forum state's long-arm statute.  Hawaii's long-arm statute, Haw. Rev. Stat. § 634-35, is coextensive with federal due process.  *See, e.g.*, *Venice PI, LLC v. Galbatross Tech., LLP*, 2019 WL 7373024, at *4 (D. Haw. Dec. 31, 2019).  Thus,

the personal jurisdiction analysis under the Hawaii long-arm statute collapses into a single due process inquiry. *Id.*

Due process requires that a nonresident defendant has "'certain minimum contacts' with the forum [state] 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). A defendant's minimum contacts can give rise to either general or specific jurisdiction. *Ayla v. Alya Skin*, 11 F.4th 972, 979 (9th Cir. 2021). A court may exercise general jurisdiction over a defendant whose connections to the forum are "so continuous and systematic" that the defendant is "essentially at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 133 n.11 (2014). For example, a court may exercise general jurisdiction over a defendant who resides in the forum state. *See id.* General jurisdiction "permits a court to hear 'any and all claims' against a defendant, whether or not the conduct at issue has any connection to the forum." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015).

A court may exercise specific jurisdiction in more limited circumstances—when a case "arises out of or relates to the defendant's contacts with the forum." *Id.* Whether specific jurisdiction is proper "depends on an affiliation between the forum and the underlying controversy, principally, activity

or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citation and quotation marks omitted) (alteration removed).  In the Ninth Circuit, courts conduct a three-part inquiry to determine whether a non-resident defendant has sufficient "minimum contacts" with the forum to warrant exercise of personal jurisdiction: (1) "the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum"; (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Wanat*, 970 F.3d at 1208.

Here, as the AS Defendants rightly assert, the court lacks personal jurisdiction over them under the Hawaii long-arm statute.  Neither AS Defendant nor any other aspect of this case have any connection whatsoever to Hawaii.  The AS Defendants live and work in American Samoa.  Plaintiffs have not alleged that they have directed any activity toward Hawaii.  And Plaintiffs' claims arise solely out of conduct that allegedly took place in American Samoa.  Simply put, there are no contacts—let alone sufficient minimum contacts—between either AS Defendant and Hawaii to support the court's exercise of personal jurisdiction under Federal Rule of Civil Procedure 4(k)(1).

2.    *The Federal Long-Arm Statute*

The question of whether personal jurisdiction exists under Federal Rule of Civil Procedure 4(k)(2) is more complicated.  Commonly referred to as the federal long-arm statute, Rule 4(k)(2) provides:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

That is, any district court may exercise personal jurisdiction over a defendant when "(1) the action arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the court's exercise of jurisdiction comports with due process." *Ayla*, 11 F.4th at 978.  Here, the first prong is not satisfied as to McGuire, against whom Plaintiffs do not allege a claim arising under federal law.  Thus, the court lacks personal jurisdiction over McGuire under the federal long-arm statute.[17]  But the first prong is clearly satisfied as to Justice Kruse because Plaintiffs assert a § 1983 claim against him.[18]

---

[17] Moreover, even if the court broadly construes the Amended Complaint to include a joint-action § 1983 claim against McGuire, *see Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003), the court would still conclude for the reasons to follow that it has no personal jurisdiction over him.

[18] Later in this Order, the court determines that Justice Kruse is properly considered a "person" acting under Territorial law (as opposed to federal law) for the purposes of § 1983.

(continued . . .)

As to the second prong, a "defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed." *Holland Am. Line, Inc. v. Wartsila N. Am.*, 485 F.3d 450, 461 (9th Cir. 2007) (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)). Because Justice Kruse resides in American Samoa and the entirety of the events giving rise to this lawsuit occurred there, the only "state" court that could exercise personal jurisdiction in this case is the High Court of American Samoa. And, indeed, Justice Kruse asserts that Rule 4(k)(2) is inapplicable here because the High Court Trial Division provides a suitable forum to adjudicate Plaintiffs' § 1983 claim against him. *See* ECF No. 143 at PageID # 2170; ECF No. 153 at PageID ## 2443-45.[19] The question thus becomes whether the High Court Trial Division is a "state's court[] of general jurisdiction" for purposes of Rule 4(k)(2).

"Rule 4(k)(2) was adopted to ensure that federal claims will have a U.S. forum if sufficient national contacts exist." *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1414, 1415 (Fed. Cir. 2009) ("The advisory committee was

---

That is, Justice Kruse is a person subject to § 1983. Further, Plaintiffs are able to bring a § 1983 claim alleging violations of their right to due process because due process is one of the "fundamental" constitutional rights that applies of its own force in the territories. *See Balzac v. Porto Rico*, 258 U.S. 298, 312-13 (1922). In contrast, § 1983 cannot be brought against persons acting under color of American Samoa law for violations of constitutional rights that do not apply in American Samoa, such as the right to equal protection and to protection against taking of property without just compensation. *See, e.g., Fitisemanu*, 1 F.4th at 880-81.

[19] McGuire likewise argues that the High Court, as a court of general jurisdiction, is competent to hear federal claims. ECF No. 146 at PageID # 2236.

concerned with defendants escaping jurisdiction in U.S. federal courts while still having minimum contacts with the United States.").  Before Rule 4(k)(2) was enacted, defendants lacking single-state contacts sufficient for personal jurisdiction under a state long-arm statute "but who had enough contacts with the United States as a whole to make personal jurisdiction over them in a United States court constitutional, could evade responsibility for civil violations of federal law." *United States v. Swiss Am. Bank, Ltd*., 191 F.3d 30, 40 (1st Cir. 1999).  The Rule's purpose guides the court's analysis as to whether the High Court may be considered a "state's court of general jurisdiction."

In addressing this second prong of the Rule 4(k)(2) test, some courts have considered only whether a state's court of general jurisdiction can exercise personal jurisdiction over the defendants.  *See, e.g.*, *Swiss American Bank, Ltd.*, 191 F.3d at 39 ("[W]e nonetheless consider it pellucid that Rule 4(k)(2)'s reference to defendants who are 'not subject to the jurisdiction . . .' refers to the absence of personal jurisdiction."); *see also* 4 Charles A. Wright et al., *Federal Practice and Procedure* § 1068.1 (4th ed.) ("[T]he court [in *Swiss Am. Bank*] correctly held that the absence of subject matter jurisdiction was irrelevant to an inquiry under the negation requirement.  Rule 4(k)(2) was intended only to correct the personal jurisdiction gap discussed in the Supreme Court's opinion in *Omni Capital International v. Rudolf Wolff & Company*[, 484 U.S. 97 (1987),] and the [contrary]

interpretation would permit unconstrained forum shopping in cases arising under exclusively federal jurisdiction statutes.").  When considering the "jurisdiction" of a state court, focusing solely on personal jurisdiction is sensible because there is no question that some court in the forum may assume subject-matter jurisdiction over the case.  *See* Erwin Chemerinsky, *Federal Jurisdiction* § 5.1 (8th ed. 2021) ("State judiciaries have general jurisdiction and may therefore hear all causes of action unless there is a statute denying them subject matter jurisdiction.").

But when applying Rule 4(k)(2) in the unique situation of a federal claim arising in the unorganized, unincorporated territory of American Samoa, an analysis that considers only personal jurisdiction could produce an outcome in which no court has both personal and subject-matter jurisdiction over a federal claim—an outcome at odds with the purpose of Rule 4(k)(2) itself, *see Touchcom*, 574 F.3d at 1414 ("Rule 4(k)(2) closed a loophole" wherein a non-resident defendant "could escape jurisdiction in all fifty states.").  For example, such an outcome would occur for a claim solely arising in American Samoa and for which there is exclusive federal subject matter jurisdiction such as patent infringement under 35 U.S.C. § 271(a).[20]  Although the High Court would have personal

---

[20] United States patent law applies to the territories, including American Samoa.  *See* 35 U.S.C. § 100(c) ("The terms 'United States' and 'this country' mean the United States of America, its territories and possessions."); 28 U.S.C. § 1338(a) ("No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents . . . . For purposes of this subsection, the term 'State' includes . . . , American Samoa, . . . .").

jurisdiction over defendants in such a case, it would presumably lack subject matter jurisdiction because it is not a federal district court, but is instead a legislative court with "discrete and limited jurisdiction" over certain federal law claims. *See Star-Kist Samoa v. M/V Conquest*, 1987 A.M.C. 1967, 1987 WL 1565394, at *1 (H. Ct. App. Div. 1987) (explaining that the High Court does not have subject-matter jurisdiction over most questions of exclusive federal law).  In such a case, there would also be no federal district court with personal jurisdiction, because there is no federal district court in American Samoa and American Samoa is not a part of any federal judicial district.  If the sole focus of Rule 4(k)(2) was on the High Court's personal jurisdiction, a Plaintiff bringing certain federal claims arising solely in American Samoa would simply be unable to prosecute those claims in *any* court, whether federal, state, or territorial.[21]  This, obviously, would thwart Congress's intent to ensure that "federal claims will have a U.S. forum if sufficient national contacts exist."  *Touchcom*, 574 F.3d at 1414.

Thus, in the unique circumstance of American Samoa, the court looks to both personal and subject-matter jurisdiction and asks two questions under the second prong of *Ayla*, 11 F.4th at 978: (1) is the High Court Trial Division a "state's court of general jurisdiction" as contemplated by Rule 4(k)(2)(A); *and*

---

[21] And there are likely other situations—besides the example of exclusive federal subject matter jurisdiction—in which claims arising in American Samoa would fall into a jurisdictional neverland if the Rule 4(k)(2) analysis focused solely on personal jurisdiction.

(2) does the High Court Trial Division have jurisdiction—both personal and subject matter—to hear the claim asserted against the defendant.  If the answer to both questions is "yes," Rule 4(k)(2) is inapplicable, and this court does not have jurisdiction via the federal long-arm statute.  This application of Rule 4(k)(2)(A) to American Samoa is consistent with the Ninth Circuit's rule that a party wanting to preclude the use of Rule 4(k)(2) "has only to name some other state in which the suit could proceed."  *Holland Am. Line*, 485 F.3d at 461.

Turning to the first question, the analysis is muddied from the outset because the High Court of American Samoa is not, literally speaking, a "state's court."  In the several states, judicial power flows from the inherent sovereignty of the states themselves and vests state courts with correspondingly inherent authority to exercise broad general jurisdiction, including over claims arising under federal law.  *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) ("Under [our] system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States.").  In contrast, territories are not considered independent sovereigns.  *Sanchez Valle*, 579 U.S. at 71.  As such, territorial courts do not possess inherent judicial power.  Instead, territorial courts were legislatively established by Congress, and it is Congress that determines the scope of their jurisdictional authority.  *See, e.g.*, *United States v. Xiaoying Tang Dowai*, 839 F.3d

877, 880-81 (9th Cir. 2016); *see Meaamaile v. Am. Samoa*, 550 F. Supp. 1227,

1235 (D. Haw. 1982) ("The courts established for American Samoa are not Article

III courts, but, rather, *legislative* courts created by virtue of the general right of

sovereignty which exists in the government and by virtue of Article IV, Section 3,

Clause 2 of the United States Constitution, which enables Congress to make all

needful rules and regulations respecting the territory belonging to the United

States." (emphasis in original)).

Nevertheless, for purposes of Rule 4(k)(2), the court concludes that

the High Court Trial Division is properly considered a "state's court of general

jurisdiction." Under 48 U.S.C. § 1661(c), sometimes referred to as the

"Temporary Organic Act," Congress determined that all judicial power in

American Samoa "shall be exercised in such manner as the President of the United

States shall direct." In turn, pursuant to Executive Order 10264 and effective July

1, 1951, the President delegated authority to the Secretary of the Interior to "take

such action as may be necessary and appropriate, and in harmony with applicable

law, for the administration of civil government in American Samoa." Using that

authority, the Secretary of the Interior approved the Revised Constitution of

American Samoa, which vests judicial power in the High Court, Am. Sam. Const.

art. III, § 1, and legislative power in a bicameral legislature, the Fono, *see* Am.

Sam. Const. art II, § 1. Thus, "the power which Congress usually delegates to a

territorial legislature by means of an organic act, the Secretary of the Interior delegated to the Fono through ratification of the American Samoan Constitution." *Vessel Fijian Swift v. Trial Division*, 4 ASR 983, 988 (1975).

And the Fono (using the authority provided to it through the Revised Constitution) has designated the High Court Trial Division "a court of general jurisdiction with the power to hear any matter not otherwise provided for by statute." ASC § 3.0208; *see also Clifton v. Voyager, Inc.* 29 Am. Samoa 2d 80, 86 (1995) (stating that the High Court is a court of general jurisdiction even though "there are areas of jurisdiction which are denied this court by federal statute"); *Purcell v. Schirmer*, 6 Am. Samoa 3d 287, 293 (2002) (stating that the Fono's designating the Trial Division a court of general jurisdiction is "a valid exercise of its power to define the High Court's jurisdiction"); *Meaamaile*, 550 F. Supp. at 1237 ("Congress may properly delegate plenary authority, including judicial authority, to govern a territory to the Executive. That is exactly what Congress has done in the case of American Samoa."); 13 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3508 (3d ed.) (stating that the High Court exercises jurisdiction "of virtually the same scope as state courts of general jurisdiction"). Given this history and the unique status of the judicial system within American Samoa, the court concludes that for the purposes of Rule 4(k)(2), the High Court Trial Division is a court of general jurisdiction.

The court next turns to the question of whether the High Court has personal and subject-matter jurisdiction to hear the federal claim at issue: a § 1983 due process claim against Justice Kruse. The High Court plainly has general personal jurisdiction over Justice Kruse, a resident of American Samoa whose alleged conduct occurred in American Samoa. *See* ASC § 3.0103(a)-(b); *Pene v. Bank of Hawaii*, 19 Am. Samoa 2d 52 (1991).

As for subject matter jurisdiction, § 1983 claims can be adjudicated in courts of general jurisdiction. *Nevada v. Hicks*, 533 U.S. 353, 366 (2001) ("It is certainly true that state courts of 'general jurisdiction' can adjudicate cases invoking federal statutes, such as § 1983, absent congressional specification to the contrary."); *Examining Bd. of Eng'rs, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 586 (1976) ("[F]ederal territorial as well as the federal district and circuit courts generally had jurisdiction to redress deprivations of constitutional rights by persons acting under color of territorial law.").

And, indeed, the High Court Trial Division has exercised jurisdiction over § 1983 constitutional claims to the extent a constitutional right applies in American Samoa. *See, e.g.*, *Bartolome v. JKL, Inc.*, CA No. 30-08, slip op. at 3-10 (Trial Div. June 21, 2012); *Vergara v. Am. Samoa Gov't*, CA No. 86-11, slip op. at 5-6 (Trial Div. Feb. 9, 2012); *McKenzie v. Leiato, et al.*, 27 Am. Samoa 2d 63, 64 (1994); *Banks v. Am. Samoa Gov't*, 4 Am. Samoa 2d 113, 128 n.7 (1987); *see also*

44

*Purcell,* 6 Am. Samoa 3d at 293-94 (finding that the High Court has jurisdiction to consider a 42 U.S.C. § 1981 claim pursuant to the authority granted it by ASC § 3.0208); *Meaamaile*, 550 F. Supp. at 1235-36 (explaining that "territorial courts are competent to decide cases arising under the Constitution and laws of the United States" and concluding that "[t]he High Court of American Samoa is, therefore, competent to decide plaintiff's federal civil rights claim"); *cf. Majhor v. Kempthorne*, 518 F. Supp. 2d 221, 251 (D.D.C. 2007) (suggesting that the High Court of American Samoa may provide an "adequate forum" for a § 1983 claim).[22]

In short, for the purposes of Rule 4(k)(2), the court finds that the High Court Trial Division is a "state's court of general jurisdiction," and the § 1983 due process claim brought in this case could be heard by the High Court Trial Division. As such, the second prong is not satisfied in this case, meaning that this court lacks personal jurisdiction over Justice Kruse under Rule 4(k)(2).[23]  Under the

---

[22] Justice Kruse correctly argues that "the language of section 1983 expressly recognizes enforcement over territorial actors and supports an inference of the High Court's jurisdiction over such claims . . . especially when viewed in conjunction with the broad jurisdictional authority of [the] High Court, created by way of the broad grant of executive authority in 48 U.S.C. § 1661(c)."  ECF No. 153 at PageID # 2444.  In fact, if the High Court could not hear § 1983 claims, most individuals residing in American Samoa would be left with a toothless, largely symbolic right.  Filing suit in the closest federal district court, some 2,500 miles from American Samoa, would be infeasible and too expensive for a vast majority of those in American Samoa.  Having provided § 1983 rights to the territories, it follows that Congress intended those rights to be enforceable in the courts of those territories.

[23] There is yet another wrinkle in this analysis: the liminal status of the unincorporated territories, which calls into question whether the High Court of American Samoa (or indeed, any territorial court) can properly be considered a forum within the United States for the purposes of

(continued . . .)

circumstances presented in this case, this court cannot exercise personal jurisdiction over the AS Defendants, under either the Hawaii long-arm statute or Rule 4(k)(2).[24]  The AS Defendants' Motions to Dismiss for lack of personal jurisdiction are GRANTED without leave to amend.

---

Rule 4(k)(2)'s analysis. *See Touchcom*, 574 F.3d at 1414 (explaining that Rule 4(k)(2) was adopted to ensure that federal claims can be adjudicated in the United States if sufficient national contacts exist).  In the Insular Cases, the Supreme Court announced that the unincorporated territories are not incorporated into the United States, but are instead "merely appurtenant" to the United States as "possession[s]." *Downes*, 182 U.S. at 341-42 ("[W]hile in an international sense Porto Rico was not a foreign country, since it was subject to the sovereignty of and was owned by the United States, it was foreign to the United States in a domestic sense, because the island had not been incorporated into the United States, but was merely appurtenant thereto as a possession.").  In short, territories remain outside the body politic of the nation; they "belong[] to" but expressly "are not a part of" the United States. *See id.* at 287.

But it is equally well-settled that territories are subject to U.S. sovereignty—and to the jurisdiction of the United States. *See, e.g., id.* at 366 (Fuller, C.J., dissenting) (explaining that although unincorporated territories are not "within the jurisdiction of any particular state" they are "within the power and jurisdiction of the United States"); *Jones v. United States*, 137 U.S. 202, 212 (1890) (holding that federal courts may exercise jurisdiction over crimes arising on island territories "appertaining" to the United States); *Fitisemanu*, 1 F.4th at 875 n.15 ("[T]he statutory and practical control exercised by the United States over American Samoa render American Samoa subject to the jurisdiction of the United States.").  Thus, for the purposes of Rule 4(k)(2)—which concerns the jurisdictional reach of federal courts—it is appropriate to consider American Samoa "part" of the nation.  Most other courts reaching this issue agree. *See, e.g., Cordice v. LIAT Airlines*, 2015 WL 5579868, at *6 (E.D.N.Y. Sept. 22, 2015) (counting contacts with Puerto Rico under Rule 4(k)(2)); *Quokka Sports, Inc. v. Cup Int'l, Ltd.*, 99 F. Supp. 2d 1105, 1112 (N.D. Cal. 1999) (same); *Western Equities, Ltd. v. Hanseatic, Ltd.*, 956 F. Supp. 1232, 1236 (D.V.I. 1997) (counting contacts with Virgin Islands under Rule 4(k)(2)); *but see Faalele v. Singapore Techs. Marine, Ltd.*, 2016 WL 6330585, at *6 (S.D. Cal. Jan. 28, 2016) (stating that the plaintiff "failed to provide the Court with any authority holding that a personal jurisdiction analysis under Rule 4(k)(2) may include U.S. territories like American Samoa").

[24] Because the Rule 4(k)(2) analysis fails at the second prong, the court does not reach the due process analysis.

Although the court finds it has no personal jurisdiction over either of the AS Defendants, the court also addresses their arguments regarding *Younger* abstention and whether the Amended Complaint fails to state a claim.

## C.   *Younger* Abstention

The United States next argues that the court should abstain from exercising jurisdiction under the doctrine of *Younger* abstention.  *Younger* abstention is a "circumscribed exception to mandatory federal jurisdiction." *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 617 (9th Cir. 2003).  Grounded in "longstanding public policy against federal court interference with state court proceedings," *Younger* abstention is mandatory when the doctrine's conditions are met.  *Younger v. Harris*, 401 U.S. 37, 43 (1971).  Conversely, when these conditions are not met, the court lacks discretion to abstain under the *Younger* doctrine.  *Id.*; *see also Vasquez v. Rackauckas*, 734 F.3d 1025, 1035 (9th Cir. 2013) ("In addressing *Younger* abstention issues, district courts must exercise jurisdiction except when specific legal standards are met, and may not exercise jurisdiction when those standards are met; there is no discretion vested in the district courts to do otherwise.").

As relevant here, federal courts abstain from exercising jurisdiction under the *Younger* doctrine when doing so would interfere with "state civil proceedings that implicate a State's interest in enforcing the orders and judgments

47

of its courts." *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043 (9th Cir. 2019);[25]

*see also New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S.

350 (1989).  To warrant *Younger* abstention in such cases, the state proceeding at

issue must satisfy a three-part test: it must be "(1) 'ongoing,' (2) 'implicate

important state interests,' and (3) provide 'an adequate opportunity . . . to raise

constitutional challenges.'" *Herrera*, 918 F.3d at 1044 (quoting *Middlesex Cnty.*

*Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

      Although framed to address "state" proceedings, courts have

consistently held that the *Younger* abstention doctrine "applies in the context of a

territory's proceedings as well." *Kendall v. Russell*, 572 F.3d 126, 130 n.3 (3d Cir.

2009) (citing *Maymo-Melendez v. Alvarez-Ramirez*, 364 F.3d 27, 34 (1st Cir.

2004) (holding that the *Younger* abstention doctrine was triggered by local

administrative proceedings in Puerto Rico)); *W. Sys., Inc. v. Ulloa*, 958 F.2d 864,

872 (9th Cir. 1992), as amended (June 23, 1992) (assessing *Younger* abstention in

context of territorial court proceedings in Guam); *Majhor*, 518 F. Supp. 2d at 250-

51 (discussing applicability of *Younger* abstention in American Samoa); *Johnson v.*

*Fitial*, 2012 WL 12542689, at *4 (D. N. Mar. I. Sept. 26, 2012) (applying *Younger*

abstention in the context of territorial court proceeding in CNMI); *Great Bay*

---

[25] *Younger* abstention is also applicable in cases where exercising jurisdiction would interfere with "(1) parallel, pending state criminal proceedings [or] (2) state civil proceedings that are akin to criminal prosecutions." *Herrera*, 918 F.3d at 1043.

*Condo. Owners Ass'n, Inc. v. Gov't of Virgin Islands*, 2018 WL 4690372, at *4 (D. V.I. Sept. 28, 2018) (raising *Younger* abstention sua sponte in the context of territorial court proceedings).

Here, the United States argues that the court should abstain from exercising jurisdiction to avoid interfering with the underlying civil lawsuit before the American Samoa High Court Land and Titles Division, HCLT # 28-2020.  The court agrees that abstention is proper as to Plaintiffs' claim for declaratory relief, but cannot abstain from exercising jurisdiction over Plaintiffs' other federal claims. *See Buckwalter v. Nev. Bd. of Med. Exam'rs*, 678 F.3d 737, 747 (9th Cir. 2012) (applying *Younger* abstention to some, but not all, of the plaintiff's claims).

*Younger* abstention is appropriate with respect to Plaintiffs' claim for declaratory relief.  Plaintiffs seek a declaration that Plaintiff Faamuli has "valid existing rights to the land and water in Alega Village" and that he, rather than the American Samoa government, has "the right to administer the beach or tidal area of Alega."  ECF No. 14 at PageID # 259.  This exact question is implicated in ongoing civil litigation before the American Samoa High Court Land and Titles Division.  *See* ECF No. 85-5 at PageID ## 1142-45.  The first *Younger* factor is satisfied because that litigation is ongoing.  The second factor is also satisfied because any ruling issued by this court on the question of declaratory relief would necessarily interfere with previous orders issued by the High Court staying

adjudication of land rights until the parties undertake statutorily mandated proceedings before the Office of Samoan Affairs.  ECF No. 85-10 at PageID ## 1215-16 (citing ASC § 43.0302); *see also Herrera*, 918 F.3d at 1048 ("Because the request for declaratory relief would have 'the same practical impact as injunctive relief on a pending state proceeding as a result of the preclusive effect of the federal court judgment' . . . *Younger* abstention is also appropriate as to such relief." (quoting *Gilberston v. Albright*, 381 F.3d 965, 975 (9th Cir. 2004))).

Abstaining in favor of the High Court Land and Titles Division is particularly appropriate here because it implicates perhaps the paramount sovereign interest in American Samoa—the determination of land rights.  Land is foundational to American Samoa's culture, identity, and system of governance. *See Craddick v. Territorial Registrar*, 1 Am. Samoa 2d 10, 14 (1980) (holding that American Samoa's government has a compelling interest in preserving the lands of American Samoa for Samoans); Am. Sam. Const. art. I, § 3 ("It shall be the policy of the Government of American Samoa to protect persons of Samoan ancestry against alienation of their lands and the destruction of the Samoan way of life and language, contrary to their best interests.").  The High Court Land and Titles Division was created by the territorial legislature for the specific purpose of adjudicating land disputes in the context of American Samoa's unique system of land rights.  *See, e.g.*, ASC § 43.0302(a).  As such, the Land and Titles Division,

more than any other tribunal, has the competence and expertise to resolve the land dispute underlying this case.

Further, the American Samoa legislature, the Fono, has mandated that land disputes undergo culturally appropriate dispute resolution before the Office of Samoan Affairs prior to litigation.  For the court to decide the land ownership question would be to substitute its judgment for that of the Fono, the Office of Samoan Affairs, and the High Court.  This would obviously—and impermissibly—interfere with basic legislative, executive, *and* judicial functions of the American Samoa government.  *See Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 883 (9th Cir. 2011) ("The key to determining whether comity concerns are implicated in an ongoing state proceeding—and thus whether the second *Younger* requirement is met—is to ask whether federal court adjudication would interfere with the state's ability to carry out its basic executive, judicial, or legislative functions.").

Finally, the third factor is satisfied because the claim for declaratory relief does not implicate any constitutional challenges.  Indeed, Plaintiffs have not raised any constitutional issues with respect to the declaratory claim, nor could they.  Adjudication of land rights in American Samoa is entirely a matter of local law.  The court thus abstains from exercising jurisdiction over the claim for declaratory relief.

The court cannot, however, abstain under *Younger* from exercising jurisdiction over Plaintiffs' other federal claims.  This is because, in order to exercise *Younger* abstention, the underlying state proceeding at issue *must* "afford an adequate opportunity" for plaintiffs to raise their "federal claims."  *Majhor*, 518 F. Supp. 2d at 251 (quoting *Bridges v. Kelly*, 84 F.3d 470, 476 (D.C. Cir. 1996)); *see also Baffert*, 332 F.3d at 617.

Here, the High Court Land and Titles Division—the tribunal adjudicating the underlying proceeding—is not a court of general jurisdiction.  It has authority to hear only "matters related to matai titles" and "controversies related to land."  ASC § 3.0208(b)(1)-(2).[26]  Given the limited jurisdiction of the Land and Titles Division, it does not appear that Plaintiffs could "interpos[e] . . . constitutional claims" in the underlying state proceeding.  *Lebbos v. Judges of Superior Ct.*, 883 F.2d 810, 815 (9th Cir. 1989).  The third *Younger* factor is not satisfied.  Accordingly, the court cannot abstain from hearing Plaintiffs' remaining federal claims.

---

[26] The limited jurisdiction of the High Court Land and Titles Division stands in contrast to the broad general jurisdiction of the High Court Trial Division, which is a "court of general jurisdiction."  ASC § 3.0208(a).

## D.    Failure to State a Claim

Plaintiffs assert the following claims:  Against McGuire they solely allege violations of the ABA Model Code of Professional Conduct.  Against Justice Kruse they allege violations of (1) the ABA Model Code of Judicial Conduct; and (2) their constitutional right to due process pursuant to 42 U.S.C. § 1983.[27]  And against the Secretary, Plaintiffs (1) allege violations of their right to due process under § 1983;[28] and (2) seek to compel her to exercise her plenary

---

[27] Initially, Plaintiffs also alleged that Justice Kruse was "in violation" of "28 U.S.C. §§ 351–364," ECF No. 33 at PageID ## 637-38, 649-50, statutory provisions that set forth procedures for individuals to file administrative complaints against any federal judge with "the clerk of the court of appeals for the circuit," 28 U.S.C. § 351(a).  But in their Opposition to Defendants' Motion to Dismiss, Plaintiffs appear to concede that they cannot state a private cause of action under these provisions.  ECF No. 127 at PageID # 1977 ("Plaintiffs' statements of fact and law relating to Justice Kruse's liability under 28 U.S.C. § 351, are valid even when, without more, 28 U.S.C. § 351 does not provide for a private cause of action." ).  In any case, Plaintiffs cannot state a claim under these provisions because they do not create a private cause of action.  Instead, by expressly creating an administrative process for individuals to air grievances against judges, these statutes demonstrate that "'Congress intended to preclude' a private right of action."  *Hueter v. AST Telecomm, LLC*, 2021 WL 3909657, at *5 (D. Haw. Aug. 31, 2021) (quoting *Northstar Fin. Advisors, Inc. v. Schwab Inv.*, 615 F.3d 1106, 1115 (9th Cir. 2010)).  Moreover, these statutes do not appear to apply to Justice Kruse—§ 351 defines "judge" as a federal "circuit judge, district judge, bankruptcy judge, or magistrate judge."  28 U.S.C. § 351(d)(1).

[28] This claim fails because a federal officer cannot be held liable for deprivation of civil rights under § 1983.  Liberally construed, the Amended Complaint may be read as alleging a civil rights action under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), in which the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Fazaga v. Fed. Bureau of Investigation,* 965 F.3d 1015, 1055 (9th Cir. 2020).  But even so, the claim still fails.  *Bivens* provides only a damages remedy against individual federal officers for actions undertaken in their individual capacity.  *Solida v. McKelvey*, 820 F.3d 1090, 1094 (9th Cir. 2016) ("*Bivens* is both inappropriate and unnecessary for claims seeking solely equitable relief against actions by the federal government.  By definition, *Bivens* suits are individual capacity suits and thus cannot enjoin official government action.").  And here, Plaintiffs have not

(continued . . .)

authority over American Samoa to rectify harms allegedly caused by McGuire and Justice Kruse.  Although the court has already determined that it lacks personal jurisdiction over McGuire and Justice Kruse, it would independently grant the Defendants' Motions to Dismiss because Plaintiffs have failed to state a cognizable claim against them.  Plaintiffs have also failed to state any cognizable claim against the Secretary.

### 1.    *ABA Model Codes of Conduct*

None of Plaintiffs' claims under the ABA Model Codes of Conduct can succeed.  The American Bar Association, the entity that publishes the model codes, is not a government entity; it is a "voluntary association" of lawyers and law students.  And the Model Codes' provisions are not laws; they are examples.  "In contrast to the Federal Rules of Civil Procedure or the Federal Rules of Evidence, the Model Rules of Professional Conduct *are not inherently binding but have come into effect only when states choose to adopt certain rules*."  Legal Information Institute, Model Rules of Professional Conduct (May 2020), https://www.law.cornell.edu/wex/model_rules_of_professional_conduct.  Indeed, each Model Code expressly proclaims that violations of its provisions do not create civil

---

pled a cognizable individual capacity suit against the Secretary.  They seek only injunctive relief—to compel the Secretary to intervene in High Court proceedings and prevent the AS Defendants from allegedly violating their due process rights.  *See, e.g.*, ECF No. 14 at PageID ## 251-52.  A *Bivens* action cannot provide the relief that Plaintiffs seek.  *See also* note 33, *infra*.

liability.  *See* American Bar Association, Model Rules of Professional Conduct: Preamble and Scope ("Violation of a Rule should not itself give rise to a cause of action . . . nor should it create any presumption in such a case that a legal duty has been breached."); American Bar Association, Model Code of Judicial Conduct: Scope ("The Code is not designed or intended as a basis for civil or criminal liability.").  In short, the Model Codes do not provide Plaintiffs any cause of action.  Plaintiffs cannot state a claim against Justice Kruse for violating the Model Code of Judicial Conduct, nor can they state a claim against McGuire for violating the Model Rules of Professional Conduct.[29]

### 2.    *42 U.S.C. § 1983*

Plaintiffs bring a civil rights claim under 42 U.S.C. § 1983, alleging that Justice Kruse violated their right to due process by engaging in "ex parte communications" with McGuire during a hearing in HCLT # 28-2020.  *See* ECF No. 33 at PageID ## 638-39.  Plaintiffs seek both damages and injunctive relief. *See* ECF No. 14 at PageID ## 267-69.  As a preliminary matter, due process is one of the few "fundamental" constitutional rights that are guaranteed in American Samoa.  *See Balzac v. Porto Rico*, 258 U.S. 298, 312-13 (1922) (explaining that

---

[29] Although McGuire has not moved to dismiss on this ground, the court may "dismiss a claim sua sponte under [Rule] 12(b)(6) . . . without notice where the claimant cannot possibly win relief."  *Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987); *see also Barnard v. U.S. Gov't*, 635 F. App'x 388, 388 (9th Cir. 2016) (mem.).

"certain fundamental personal rights declared in the Constitution, as, for instance, that no person could be deprived of life, liberty, or property without due process of law" apply in the unincorporated territories).  But, even so, Plaintiffs have not stated a cognizable claim for either form of relief.

First, Plaintiffs' claim for damages is barred by the common-law doctrine of judicial immunity.  *Lund v. Cowan,* 5 F.4th 964, 970 (9th Cir. 2021), *petition for cert. docketed*, No. 21-790 (Nov. 29, 2021) ("'It is well settled that judges are generally immune from suit for money damages.'" (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1133 (9th Cir. 2001))); *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 n.1 (9th Cir. 2020) ("Judges are also entitled to absolute immunity from damages suits.").

Judicial immunity applies not only to Article III judges, but to all "officers whose functions bear a close association to the judicial process." *Demoran v. Witt,* 781 F.2d 155, 156 (9th Cir. 1985), as amended (Jan. 24, 1986). The analysis "turns on the nature of the responsibilities of the officer and the integrity and independence of his office."  *Id.* at 156-57 (explaining that judicial immunity has been afforded to administrative law judges, prosecutors, state parole officers, grand jurors, and even witnesses based on the scope of the duties they perform); *cf. Butz v. Economou*, 438 U.S. 478, 513-14 (1978) (explaining that administrative law judges enjoy absolute judicial immunity despite being executive

branch officials because they perform an "adjudicatory function"); *see also Hueter v. Kruse*, 2021 WL 3052034, at *2 (D.D.C. July 20, 2021) (applying judicial immunity doctrine to Article IV judge). Plainly, judicial immunity extends to Justice Kruse as Chief Justice of the High Court of American Samoa.

Judicial immunity is not absolute—it "only applies to judicial acts." *Lund*, 5 F.4th at 971. To determine whether an act is judicial, courts consider whether "'(1) the precise act is a normal judicial function; (2) the events occurred in the judge's chambers; (3) the controversy centered around a case then pending before the judge; and (4) the events at issue arose directly and immediately out of a confrontation with the judge in his or her official capacity.'" *Id.* (quoting *Duvall*, 260 F.3d at 1133). With these factors in mind, there is no question that judicial immunity bars Plaintiffs' § 1983 claim for damages against Justice Kruse. As to factors one and two, the alleged act took place in Justice Kruse's courtroom while he was on the bench. And as to factors three and four, Plaintiffs are in essence attacking a verbal ruling that Justice Kruse issued in a case pending before him— that is, a ruling he issued while acting in a judicial capacity. Further, Plaintiffs' allegations that the ex parte communication was "illegal" or otherwise improper is of no import. Judicial immunity bars suits against judges acting in a judicial capacity "even if the judge acted with 'malice or corruption of motive.'" *Id.*

(quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)).  Judicial immunity shields Justice Kruse from Plaintiffs' damages claim.

Plaintiffs' claim for injunctive relief raises much more complicated legal questions.  But after careful consideration, the court concludes that Plaintiffs have also failed to state a § 1983 claim for injunctive relief.

Section 1983 allows a plaintiff to pursue injunctive relief against "every person" who, acting under color of "State or Territory" law, caused a deprivation of the plaintiff's civil rights.  As a threshold matter, the court must determine whether, for the purposes of § 1983, Justice Kruse is a person acting under color of territory law.

It is well-settled that territorial officers acting under color of territorial law in the *organized* territories may be subject to injunctive relief pursuant to § 1983.  *See, e.g.*, *Paeste v. Gov't of Guam*, 798 F.3d 1228, 1237 (9th Cir. 2015) (Guam); *Russell v. Richardson*, 905 F.3d 239, 248-49 (3d Cir. 2018) (Virgin Islands); *Norita v. N. Mariana Islands*, 331 F.3d 690, 695-96 (9th Cir. 2003) (CNMI); *Borras-Borrero v. Corporacion del Fondo del Seguro del Estado*, 958 F.3d 26, 35 (1st Cir. 2020) (Puerto Rico).  In the organized territories, it is clear that territorial officials are acting pursuant to "territorial law" because Congress has delegated legal authority to each territory's government through that territory's organizing legislation.  *See, e.g.*, *Paeste*, 798 F.3d at 1238 (explaining that the

Guam Organic Act "delegates . . . authority to Guam officials"); *Norita*, 331 F.3d at 695 (explaining that § 1983 applies in CNMI through the territory's covenant of political union with the United States); *Harris v. Boreham,* 233 F.2d 110, 113 (3d Cir. 1956) (explaining that because Congress delegated authority to the U.S. Virgin Islands through the territory's organic act, "[t]he local laws enacted under the legislative power granted by Congress are accordingly territorial laws, not laws of the United States").

In contrast, American Samoa does not have an organic act or any other organizing legislation, meaning Congress has not similarly delegated legal authority to the territorial government of American Samoa. *Cf. Territory of Am. Samoa v. Nat'l Marine Fisheries Serv.*, 822 F. App'x 650, 651 (9th Cir. 2020) (mem.) (questioning whether American Samoa, as an unorganized territory, can assert standing as *parens patriae*). Instead, American Samoa's government operates "under the direct control and supervision of the Secretary of the Interior." *Hodel II*, 830 F.2d at 385. Thus, for example, the American Samoa legislature cannot pass legislation without approval of the Secretary of the Interior. *See* Am. Sam. Const. art. II, § 9. And although the judicial power of the American Samoa courts is enshrined in the territory's constitution and statutory code, the Secretary retains authority to "review and reverse" decisions of the High Court. *Hodel II*, 830 F.2d at 383; *see also Fitisemanu*, 1 F.4th at 875 n.15. Given these attributes,

American Samoa appears—much more so than any other territory—to operate as "'an instrumentality of the federal government,'" akin to "a federal department or administrative agency." *Paeste*, 798 F.3d at 1236 (quoting *Ngiraingas v. Sanchez*, 858 F.2d 1368, 1370 (9th Cir. 1988)). Such a status suggests that American Samoa territorial officials may be acting under color of *federal* rather than territorial law, and, consequently, that § 1983 may not apply to them. *See id.* at 1237 (rejecting this argument with respect to Guam officials).

But considering the history and remedial purpose of § 1983, as well as the practical realities of governance in American Samoa, the court concludes that § 1983 applies to territorial officers there. Section 1983 was enacted as the Civil Rights Act in 1871 in order to protect recently emancipated black citizens, especially in the South, from murders, assaults, and other rights deprivations at the hands of whites. *Ngiraingas v. Sanchez*, 495 U.S. 182, 187 (1990). Specifically, Congress was worried "about the insecurity of life and property in the South," and promulgated the Civil Rights Act "primarily in response to the unwillingness or inability of the state governments to enforce their own laws against those violating the civil rights of others." *Id*. As enacted, the Civil Rights Act only imposed liability against persons acting under color of "State" (and not territorial) law. *Id.* at 188 (citing 17 Stat. 13).

In 1874, the statute embodying the Civil Rights Act was amended to extend liability to persons acting under color of territorial law as well. *Id.* at 190. At that time, the inhabited territories were exclusively within the continental United States. And although those continental territories were intended for eventual incorporation into the Union as states, until they were ready for statehood, the federal government exercised "full and complete legislative authority over the People of the Territories and all the departments of the territorial governments," including the power to "make a void Act of the territorial government valid, and a valid Act void." *Nat'l Bank v. Cnty. of Yankton*, 101 U.S. 129, 133 (1880); *see also Sere v. Pitot*, 10 U.S. 332, 336-37 (1810); *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 542-43 (1828).

These territories and their governance regimes were established through organic acts. But unlike the organic acts later enacted for the overseas territories—which delegate authority to a territorial government elected by the people of that territory—these early organic acts provided that local officials in the continental territories were "federal officers," appointed by the President and under the control of the federal government. *See, e.g.*, Act of Congress Organizing the Territory of Nevada (1861); An Act to Organize the Territory of Kansas (1854); Michigan Organic Act of 1805; *see also* Letter from Attorney General to Secretary of State, Aug. 22, 1799, in Clarence Edward Carter, ed., *The Territorial Papers of*

*the United States: Vol. III*, 66-67 (1934) (opining that "all persons in authority" in the territories "derive their authority from the present constitution of the United States"); Gregory Ablavsky, *Administrative Constitutionalism and the Northwest Ordinance*, 167 U. Pa. L. Rev. 1631, 1633 n.12 (2019) (discussing the status of territorial officials as federal officers under the Northwest Ordinance of 1787, which established the blueprint for all later continental expansion through annexation, administration, and eventual incorporation of new territories).

Although the continental territories were solely under federal control and their officials formally acted under color of federal law, territorial officials could be held liable for deprivation of rights under the Civil Rights Act.  Indeed, the remedial purpose of the amended Act applied with equal force in the territories, which were sites of much racially-motivated violence and bloodshed.  *Ngiraingas*, 495 U.S. at 196-97 (Stevens, J., dissenting) (summarizing legislative history).

Moreover, given the difficulties of governing far-flung territories, "Congress . . . lacked effective control over actions taken by territorial officials, although its authority to govern was plenary."  *Flores de Otero*, 426 U.S. at 596. Thus, lawmaking and day-to-day administration of the continental territories were largely carried out by territorial officials acting outside the control of the federal government.  *See Dist. of Columbia v. Carter*, 409 U.S. 418, 430 (1973) ("It is true, of course, that Congress also possessed plenary power over the Territories.

For practical reasons, however, effective federal control over the activities of territorial officials was virtually impossible.  Indeed, the territories were not ruled immediately from Washington . . . .  Rather, Congress left municipal law to be developed largely by the territorial legislatures, within the framework of organic acts and subject to a retained power of veto."); *see also* Gregory Ablavsky, *Federal Ground*: *Governing Property and Violence in the First U.S. Territories* 8 (2020) (discussing territorial administration in the Northwest and Southwest territories, and explaining that despite nominally exclusive federal control, "in practice, local governance in the territories was nearly identical under both structure and personnel to what had existed under state rule; often, the sole acknowledgement of the advent of federal sovereignty was a new caption in the county record book"). Thus, even with respect to the continental territories, the federal government's "practical control" was "confused and ineffective, . . . making the problem of enforcement of civil rights in the Territories . . . similar to the problem as it existed in the States." *Carter*, 409 U.S. at 431.

In contrast, the Civil Rights Act did not apply in the District of Columbia because, as the nation's capital, local officials there could more easily be controlled by federal officials.  *Carter*, 409 U.S. at 431.[30]  Simply put, because

---

[30] The District of Columbia and the continental territories also differed based on the permanence of their status.  The District of Columbia is "an exceptional community established

(continued . . .)

officials in the early continental territories were *effectively* acting under color of territorial rather than federal law, they needed to be subject to liability for deprivation of civil rights under the Civil Rights Act.

Like the early continental territories, American Samoa, although under the plenary authority of the Secretary of the Interior, is for all intents and purposes administered by its territorial government. The people of American Samoa adopted a territorial constitution of their own accord, which was later approved by the Secretary. This constitution vests power in the legislative, executive, and judicial branches to carry out governmental functions. In addition, the Department of Interior has virtually no involvement in the day-to-day operations of the territory; instead, territorial laws are upheld and enforced by the

---

under the Constitution as the seat of the National Government . . . as lasting as the states from which it was carved or the union whose permanent capital it became." *Carter*, 409 U.S. at 432. The continental territories, meanwhile, were "[f]rom the moment of their creation, . . . destined for admission as States into the Union, and as a preliminary step toward that foreordained end— to tide over the period of ineligibility—Congress, from time to time, created territorial governments, the existence of which was necessarily limited to the period of pupilage." *Id.* at 431-32. Thus, another reason that § 1983 applied to continental territorial officials was that "Congress could reasonably treat the Territories as inchoate States, quite similar in many respects to the States themselves, to whose status they would inevitably ascend." *Id.* at 432.

The unincorporated territories are yet different. They are decidedly not destined for statehood. *Fitisemanu*, 1 F.4th at 865 n.1 ("An 'unincorporated territory' is a territory 'not intended for statehood.'") (quoting *Atalig*, 723 F.2d at 688). They are, however, considered to be "in a condition of temporary pupilage and dependence," *Dorr v. United States*, 195 U.S. 138, 148 (1904), ostensibly on a path toward self-determination. *See Tuaua II*, 788 F.3d at 311-12; *Downes*, 182 U.S. at 343-44 ("[I]t would be a violation of duty under the Constitution" to "permanently hold territory which is not intended to be incorporated. . . . [T]herefore, when the unfitness of particular territory for incorporation is demonstrated, the occupation will terminate."). The inchoate status of the unincorporated territories suggests that they are more akin to the early continental territories than to the District of Columbia.

territorial officials.  *See Meaamaile*, 550 F. Supp. at 1237 (summarizing operations of the American Samoa government); *see also* Elissa Waters, *Placing Theories of Governance*: *A Political Geography of American Samoa* 172 (2018) (explaining that *de facto* authority in American Samoa rests with the territorial government despite the *de jure* plenary power of the federal government).  And, as in the early continental territories, although the acts of the Fono are subject to veto by the Secretary of the Interior, they carry the force of law unless and until the Secretary exercises that power—something that is seldom done.  *See, e.g.*, *Hodel II*, 830 F.2d at 230-31.

It follows that in order to effectuate the remedial purpose of § 1983, the individuals practically empowered to govern should be held responsible for civil rights violation perpetrated under color of their legal authority.  *See Majhor*, 518 F. Supp. 2d at 235 (suggesting American Samoa territorial officials should be subject to suit under § 1983).  Justice Kruse's authority as Chief Justice of the High Court is found in the American Samoa Constitution and in statute in the American Samoa Code.  *See* Am. Sam. Const. art. III; ASC tit. 3.  Practically, his rulings have the force of law in American Samoa.  As such, Justice Kruse is properly considered a person acting under color of territorial law for the purposes of § 1983.

Although the court is convinced that § 1983 applies to territorial officials in American Samoa, it nonetheless concludes that Plaintiffs have failed to state a claim against Justice Kruse.  This is because judicial officers are immune from claims for injunctive relief under § 1983 "unless a declaratory decree was violated or declaratory relief was unavailable."  42 U.S.C. § 1983; *see also Moore v. Urquhart*, 899 F.3d 1094, 1104-05 (9th Cir. 2018); *Gilliam v. Watanabe*, 2020 WL 5223778, at *4 (D. Haw. Sept. 1, 2020) (dismissing complaint against state court judge where the plaintiff's complaint did "not allege that 'a declaratory decree was violated or that declaratory relief was unavailable'").

Plaintiffs argue that they are "entitled to injunctive relief against . . . Justice Kruse due to the fact that he . . . made Declaratory Relief unavailable by placing a stay on HCLT [# 28]-2020 and prohibiting any further filings."  ECF No. 33 at PageID # 639.  "Declaratory relief against a judge for actions taken within his or her judicial capacity is ordinarily available by appealing the judge's order in state [or territorial] court."  *Yellen v. Hara*, 2015 WL 8664200, at *11 (D. Haw. Dec. 10, 2015).  Plaintiffs have made no effort to appeal Justice Kruse's order.  They nevertheless argue that they "are not able to file Appeals in the High Court" because they have sued Justice Kruse and High Court Associate Justice Fiti Alexander Sunia in a separate proceeding.  ECF No. 127 at PageID # 1947; *see also Hueter*, 2021 WL 3052034.  They also argue that any Appellate Division

proceedings will necessarily be biased against them because "Defendants Kruse and Sunia . . . form the majority of the quorum on the Appellate Division."  ECF No. 127 at PageID # 1947.[31]  These arguments fail.

Plaintiffs merely assume that Justices Kruse and Sunia will be biased against them.  And Plaintiffs merely assume that Justice Kruse and Sunia will make up the majority of the quorum.  But they are incorrect.  Section 3.1007(b) of the American Samoa Code specifically provides that "[n]either the Chief Justice, nor the Associate Justice, nor any associate judge of the High Court shall sit in the appellate division of that court in the hearing and determination of any appeal from the decision of a case or question decided by him, or the decision of which he joined in the trial court."  That is, Justice Kruse is legally prohibited from sitting on an appeal from his trial-level decision.  In addition, section 3.1007(a) provides that "[n]o judge shall sit in any case in which he . . . has a substantial interest."  To the extent that Plaintiffs are concerned that Justice Sunia would be biased against them on appeal because they have sued him in an unconnected matter, they may seek to

---

[31] The American Samoa Code provides that "[s]essions of the appellate division shall be held before 3 justices and 2 associate judges, the presence of 2 of the justices and 1 associate judge being necessary to constitute a quorum for the trial and determination of a case or controversy."  ASC § 3.0220.  Where the appellate panel disagrees, "the opinion of 2 of the justices shall prevail," except in land or matai title cases, in which "the opinion of the majority of the 5 judges shall prevail."  *Id.* § 3.0221.

disqualify him on this ground.[32]  At this stage, the assertion that appellate relief is unavailable is pure speculation.

Moreover, Plaintiffs have another avenue to seek declaratory relief—they may petition the Secretary of the Interior directly.  "[T]he Secretary has the authority to review decisions of the High Court to assure they comply with any standards of the United States Constitution found to apply to American Samoa." *Barlow v. Sunia*, 2019 WL 5929736, at *2 (D. Haw. Nov. 12, 2019) (citing *Hodel I*, 637 F. Supp. at 1413 n.29).  The Secretary of the Interior has "likewise acknowledged his or her power to intervene and review decisions of the High Court—even if he or she chooses not to exercise this power."  *Id.* (citing *Hodel II*, 830 F.2d at 376, 378-79).

Because no "declaratory decree was violated," and "declaratory relief" was otherwise available, Justice Kruse is immune from suit for injunctive relief under § 1983.[33]

---

[32] Further, the Secretary of the Interior has discretion to "appoint . . . such Associate Justices as [she] may deem necessary" in cases where the ordinary panel would not be able to review the case impartially.  Am. Sam. Const. art. III, § 3.  And, indeed, the Secretary of the Interior has done so many times before.  *See Hodel I*, 637 F. Supp. at 1413 ("The Secretary of the Interior also frequently appoints as associate justices members of Article III federal courts in the United States to serve on the appellate division court.").

[33] The court also points out that in reviewing the transcripts in the underlying High Court case, it discerns absolutely no evidence of bias or wrongdoing on behalf of Justice Kruse. Rather, it appears that Justice Kruse provided injunctive relief in favor of Plaintiffs, stating that Bluesky is enjoined from "failing to clean" detritus on Plaintiffs' property, but then noted that such relief would not extend to detritus caused by third-parties (such as the American Samoa

(continued . . .)

3. *Injunctive Relief Against the Secretary of the Interior Under* King v. Morton

Finally, Plaintiffs ask this court to order the Secretary of the Interior to exercise her "plenary authority over the Defendant Kruse to stop him from violating the constitutional rights of due process of Plaintiffs," including by preventing him from "interfering with the clean-up of Alega Beach." ECF No. 127 at PageID # 1961.[34] This relief is unavailable to Plaintiffs.

---

Telecommunications Authority) or to property not owned by Plaintiffs (such as tidelands that may be under control of the American Samoa Government). Further, as discussed above, Justice Kruse imposed a stay in the case for a perfectly legitimate reason—because the court lacked subject-matter jurisdiction until the parties completed mandatory pretrial proceedings before the Office of Samoan Affairs.

Finally, it is obvious that Plaintiffs take Justice Kruse's statements out of context as "proof" of his bias. For example, Plaintiffs allege that Justice Kruse's statement that "I'm $5,000 an hour if you want to talk to me privately" "emanates 'corruption.'" ECF No. 127 at PageID # 1950. Not so. Justice Kruse was in fact stating that as an impartial judicial official he could not provide the parties with legal advice, and joked that if a party wished to hire him as private counsel he would cost an exorbitant $5,000 an hour. ECF No. 127-1 at PageID ## 1994-95 ("I don't give legal advice. I'm $5,000 an hour if you want to talk to me privately."). Plaintiffs' attempt to contort this obvious attempt at humor into something sinister is both unavailing and unappreciated.

[34] The court construes Plaintiffs' official capacity claim as one alleging a claim against the Secretary for prospective injunctive relief directly under the Constitution. *See Schneider v. Smith*, 390 U.S. 17, 21-22 (1968); *Porter v. Califano*, 592 F.2d 770, 781 (5th Cir. 1979) ("[Plaintiff] would of course have a right to sue directly under the constitution to enjoin . . . federal officials from violating her constitutional rights." (citing *Arnett v. Kennedy*, 416 U.S. 134 (1974))); *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 41 (1st Cir. 2002); *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 9.2.2 (8th ed. 2021). The claim might also be liberally construed as arising under the Mandamus Act, 28 U.S.C. § 1361, or the Administrative Procedure Act, 5 U.S.C. § 706(1). *See Plaskett v. Wormuth*, 2021 WL 5407766, at *5 (9th Cir. Nov. 19, 2021) (explaining that relief under both § 1361 and § 706(1) is available only if "(1) the claim is clear and certain; (2) the official's or agency's 'duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt'; and (3) no other adequate remedy is available." (quoting *Agua Caliente Tribe of Cupeno Indians of Pala Rsrv. v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019))). But regardless of how the claim is construed, it fails.

As discussed above, Plaintiffs are correct that "the Secretary has the authority to review decisions of the High Court to assure they comply with any standards of the United States Constitution found to apply to American Samoa." *Barlow*, 2019 WL 5929736, at *2. But whether the Secretary is required to exercise that authority depends on the circumstances of the individual case. *See Hodel II*, 830 F.2d at 378 (explaining that the Secretary declined to intervene in High Court proceedings because "a decision to intervene in the judicial system of American Samoa 'cannot be taken lightly,' as any intervention might jeopardize the United States policy of 'fostering greater self-government and self-sufficiency without disturbing the traditional Samoan cultural values.'"); *King*, 520 F.2d at 1146 (suggesting that a district court may be able to compel the Secretary to intervene in the American Samoa judicial system on a writ of mandamus pursuant to 28 U.S.C. § 1361 where the Secretary has a "clearly established, plainly defined and peremptory duty").

Here, the Secretary does not have a ministerial duty to intervene on Plaintiffs' behalf. In *King*, the D.C. Circuit considered whether it could enjoin the Secretary, as administrator of the American Samoa judicial system, from enforcing court rules, American Samoa statutory provisions, and "rules and regulations of the Secretary of the Interior" that denied criminal defendants the right to trial by jury. 520 F.2d at 1143, 1145-46. Noting probable jurisdiction, the D.C. Circuit

remanded to the district court, which found the rules to be unconstitutional.  *See King v. Andrus*, 452 F. Supp. 11, 17 (D.D.C. 1977).  The District Court accordingly enjoined the Secretary, "his appointees, agents, employees, and all other persons subject to his authority and control from enforcing any judgment of criminal conviction against plaintiff obtained without according him a right to trial by jury."  *Id.*  From *King*, it is clear that the Secretary has an obligation not to promulgate or enforce unconstitutional rules in American Samoa.

By contrast, here, Plaintiffs do not challenge a law or rule as unconstitutional.  Rather, they ask the Secretary to overturn a single decision issued by Justice Kruse.  And, although the Secretary appears to have the power to review and overturn court decisions, her duty to intervene in individual cases is discretionary.  *Hodel I*, 637 F. Supp. at 1410 (holding that the Secretary's decision not to intervene in a High Court case was not an abuse of discretion), *aff'd* 830 F.2d 374.  This court has no power to compel the Secretary to engage in a discretionary act.  Accordingly, Plaintiffs have no claim against the Secretary of the Interior.  If Plaintiffs wish to seek relief from the Secretary, the proper avenue is to petition her directly and ask her to intervene, not to sue her in federal court.[35]

---

[35] In their Opposition to the Motion to Dismiss, Plaintiffs also ask the court, for the first time, to compel the Secretary to "appoint neutral, temporary Justices to the High Court" to hear Plaintiffs' appeal of Justice Kruse's order.  ECF No. 127 at PageID # 1947.  This request is not properly before the court, and if it was, the request would be denied.

# V.  **CONCLUSION**

The claims against Defendants Michael Kruse and James McGuire DISMISSED for lack of personal jurisdiction.  Further, the Amended Complaint fails to state a claim against any of the Defendants.  Because granting leave to amend would be futile, all claims are DISMISSED with prejudice.  The Clerk of Court shall close the case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 17, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Hueter v. Kruse*, Civ. No. 21-00226 JMS-KJM, Order Granting (1) Federal Defendants' Motion to Dismiss, ECF No. 85; and (2) Defendant James L. McGuire's Motion to Dismiss, ECF No. 136